## JABEZ HILL *v.* ASA WENTWORTH, Jr.

### *Fixtures.*

Not only the manner and extent, but the object and purpose of the annexation of a chattel to a building, is to be considered in determining whether it has become a fixture and part of the realty.

That the article is essential to the use of the building for the business for which it is used, is not the test by which to determine whether or not it is a part of the realty.

To change the character of an article from a chattel to a fixture there should be some positive act and intent to that effect, on the part of the person annexing it to a building; and, if the intent is left in doubt upon an inspection of the property itself, taking into consideration its nature, the mode, extent, purpose and object of its annexation, it should be held to remain personal property.

Articles of machinery used in a manufactory do not become a part of the freehold when they are only attached to the building for the purpose of keeping them steadier, and in a manner best adapted to that purpose, so that their use as chattels may be more beneficial, and are attached in such a way that they may be removed without injury to the freehold or to the articles themselves as chattels.

An iron boiler, in a paper-mill, set in brick-work which was laid on a stone foundation placed in the ground up to which the floor was laid, together with the iron pipe connected with it by screws and bolts; engines for grinding rags, fixed in tubs standing on timbers up to which the floors of the building were scribed;—paper presses fastened to the building by cleats and with screws and nuts; calendar rolls in an iron frame screwed to timbers which were spiked to the floor;—a rag-cutter; —a trimming-press set in a frame which was screwed to the floor, and a machine for making paper, which was fastened to the floor by cleats nailed around it and in no other way, held to be no part of the real estate, as between mortgagor and mortgagee;—but otherwise of the iron shafting put up in the building by hangers of iron bolted to the beams and sills, and used for turning and carrying the machinery.

TROVER for a quantity of iron. Plea, the general issue; trial by jury, April Term, 1855,—UNDERWOOD, J., presiding.

The plaintiff, to support the issue on his part, put into the case two mortgage deeds from James I. Cutler, Henry Green and Alexander Fleming, to the plaintiff, of certain lands therein described, and among the rest of a paper-mill; also a decree of foreclosure of said mortgages in September, 1846, in which the time of redemption was limited to the 7th of October, 1847.

One of the mortgage deeds above referred to, and upon which the decree was founded, contained among other things, in the description of the estate mortgaged, the following: "also the paper-mill, dry-house and size-house, situated at Bellows Falls, now used and improved for making paper, together with the land on which said paper-mill, dry-house and size-house are situated."

The plaintiff's evidence tended to show that sometime after the execution of said mortgages, the paper-mill building was taken down and another building substituted in the same place, and fitted up for manufacturing paper, with fixtures and machinery, and occupied by the mortgagors for manufacturing paper as before. The plaintiff's evidence further tended to show that an iron boiler was fitted up in said building, near the centre, in brick-work laid on a

stone foundation placed on the ground, and that the floor of the building was laid up to it, but was attached to the building in no other manner; that four engines for grinding rags into pulp, fixed in large oval tubs, in the usual way, were fitted up in the building, the tubs standing on timbers, and the floor of the building scribed up to them, which were attached to the building in no other way, saving that they were carried and operated by a band from shafting hereafter named, which carried the machinery: and that there were five paper presses with screws of iron, the lower ends of which dropped through the floor to the ground, and were in no other way attached to the floor, and their upper ends surrounded by cleats nailed to the floor over head, to keep them in place, which, by taking off some iron nuts, could be taken out without injuring or disturbing the building; four calender rolls, placed in an upright iron frame, the frame standing on timbers spiked to the floor, and the toes of the frame screwed to the timbers; a rag-cutter put into a wooden frame, which stood on the floor, and was in no other way confined; a trimming press, set in a frame about the size of a four-foot table and screwed to the floor; a machine for making paper, which stood upon the floor, and was in no way fastened to the building, except by cleats nailed round it to the floor; iron pipes connected with the boiler by screws and bolts, which could be easily taken off, and iron shafting put up in the building for turning and carrying the machinery, by hangers of iron bolted to the beams and sills, which could be taken down by unscrewing the bolts.

The testimony further tended to show that these fixtures and machinery were composed of iron in various conditions, (in part,) such as screws, hoops, rollers, gudgeons, spikes, &c., &c., and were put up by said mortgagors, and were necessary and usual for manufacturing paper in paper-mills, and designed to be used there permanently for manufacturing paper, except as they might be repaired as occasion required; and that on the 13th of July, 1846, and before the plaintiff had taken possession of the premises, said paper-mill, fixtures and machinery were consumed by fire, leaving all the irons of said fixtures, machinery and the building, scattered about in the ruins, in which situation, it appeared, the iron was collected and deposited in a building by direction of the mortgagors,

and the defendant, who was their creditor, caused them to be attached on a writ against said mortgagors, and to be sold on his execution, except a portion which he sold at private sale, by consent of the mortgagors; and this iron so sold was the same contained and named in the declaration. There was no evidence to show the plaintiff had any other title to said property, than by virtue of said mortgages. The sale was made before the time of redemption in said decree had expired, and before the plaintiff took possession of the premises.

The defendant requested the court to charge the jury that said machinery and fixtures were personal property, and did not pass by the deeds, and that, therefore, the plaintiff was not entitled to recover for any portion of the iron composing them. The court refused to charge as requested, but did charge, substantially, that such of said machinery and fixtures detailed in the testimony as were placed and used there by the mortgagors, and designed to be and remain there permanently, being necessary and usual for manufacturing paper, and were in any way fixed to the building, whether by nails, screws, spikes or cleats, or were made to stand upon the ground or timbers with the floor built up to them, and within the main building, were to be regarded a part and parcel of the paper-mill and of the realty, and would pass by virtue of said mortgages; and that, whatever of the iron sued for, the jury should find composed said fixtures or machinery detailed in the testimony, in whole or in part, for that the plaintiff should recover.

Exceptions by the defendant.

*H. E. Stoughton* for the defendant.

To constitute fixtures, it is requisite that the articles be actually affixed or annexed to the realty, and so firmly that they cannot be removed without actual injury to the freehold by the removal, apart from the abstraction of the thing removed; and whether personal property or fixtures must be determinable by inspection of the property itself, considering the use, nature and intention of the party annexing it. *Fawn* v. *Stackpole*, 6 Greenl. 154; *Teafft* v. *Hewett*, (Ohio Sup. Court,) reported in Law Reg. for 1853; *Swift* v. *Thompson*, 9 Conn. 63; *Gale* v. *Ward*, 14 Mass. 352; *Cresson* v. *Stout*, 17 Johns. 116; *Walker* v. *Sherman*, 20 Wend. 636; *Far-*

*rer* v. *Chauffute*, 5 Denio 527 ; *Taffe* v. *Warwick*, 3 Blackf. 111 ; *Line* v. *Billamy*, 12 N. H. 205 ; *Tobias* v. *Francis*, 3 Vt. 425 ; *Sturgis* v. *Warren*, 11 Vt. 433.

*D. & G. B. Kellogg* for the plaintiff.

The conveyance of a " paper-mill, dry-house and size-house," conveys that which is necessary to the carrying on of the paper-making business. Steam engines, boilers, bands, gearing, stoves set in brick, &c., pass with the freehold ; *Winslow* v. *Insurance Co.*, 4 Met. 306 ; 6 Greenl. 155 ; *Nolle* v. *Bosworth*, 19 Pick. 314 ; 15 Mass. 159 ; 7 Mass. 432.

There is a wide distinction between landlord and tenant and mortgagor and mortgagee, which is well defined in 4 Met. 306.

A mortgage will embrace all fixtures, unless, by its terms, it was the intention of the parties not to embrace them. 15 Mass. 159 ; 2 B. & C. 76.

The opinion of the court was delivered by

BENNETT, J. This is a case of very considerable practical importance, and we have endeavored to give it the attention which its importance demands. The charge assumes that, if the machinery in the mill was necessary and usual for the purpose of manufacturing paper, and designed to be and remain in the mill permanently, it became a part of the realty, however slightly it may have been attached to the freehold. There are, no doubt, cases in the books, which will fully warrant the charge of the court, and of that character is the case of *Farrar* v. *Stackpole*, 6 Greenleaf 157, to which we have been referred, (and which seems to be an extreme case,) while others take an opposite view, and hold that the *annexation* must be substantial, and such that the chattel cannot be severed without substantial injury to the freehold, beyond what shall result from an abstraction of the thing removed. The first inquiry should be, what has been the tendency of our own decisions in relation to the matter ?

In *Wetherby* v. *Foster*, 5 Vt. 136, it was held that potash kettles, set in brick arches, in the usual manner, with chimneys to the arches, and used for manufacturing purposes, still remained personal property. The court said, p. 142, if the kettles were fastened

to the freehold at all, it was temporary merely, and the injury to the brick-work, in taking them out, *was too trifling to designate them real estate while there.* In *Tobias* v. *Francis,* 3 Vt. 425, the question arose between the mortgagee and a creditor of the mortgagor, and it was held that carding machines, in a woolen factory, and connected by a band with other wheels in motion, by which they were propelled in the usual way, and which remained stationary by means of their own weight, were still personal property, and, as such, might be attached and taken away.

In *Sturgis* v. *Warren,* 11 Vt. 433, the question also arose between the creditors of the mortgagors and the assignee of the mortgagee, and the carding machines were affixed to the factory building in the usual manner, *some with nails, some with spikes and screws,* and *some with cleats,* and yet, upon the authority of the case of *Tobias* v. *Francis,* they were held to be personal property. In *Cross* v. *Marston,* 17 Vt. 534, the case of drawers, and the sash case, were placed in a building, which was fitting up for a book store. The case of drawers was nailed to the wall, and open shelves were placed in the space above. The sash of the show-case was used to cover an open book-case, which was permanently fastened to the wall of the building,—the sash sliding in a place before the book-case, and being fastened in by strips of boards nailed above and below. The question arose between vendor and vendee, and the case was made to turn on the question whether the chattels had, by the manner of their *annexation* to the freehold, lost their *personal identity as chattels,* and it was held they had not, the court applying, *as the test,* the fact that the articles could have been taken out of the building without injury to themselves, or the building, which was assumed both by the counsel and the court, although, from the report of the case, I do not see that it was a fact distinctly found in the bill of exceptions.. From the cases already decided in this state, upon a subject which, from its very nature, is perplexing, and rendered more so by the conflicting views of different courts, it is quite evident our courts have assumed the ground that a chattel is not to lose its personal identity, as such, unless it has been substantially annexed to the freehold, in a manner which would not permit it to be separated from it, without material injury to itself or to the freehold. We apprehend

29

there is no sufficient reason why we should, at the present day, re-cede from the ground already taken by our courts. It is certainly sustained by many well considered cases.

In *Swift* v. *Thompson,* 9 Conn. 63, the spinning frames in a cotton factory stood upon the floor, and were kept in their place by means of cleats nailed to the floor around them, and there was other machinery, to the posts of which iron plates were attached, through which wood screws passed, fastening them into the floor, but by unscrewing them the machinery could be removed without injury to it or the building, and it was held that the whole ma-chinery remained personal property. DAGGETT, J., says it is material to consider that the machinery was thus attached to the building to render it stable, and that the criterion established by the rules of the common law is, *could this property be removed without injury to the freehold?* See also *Taffe* v. *Warwick,* 3 Blackford 111. The New York cases are very full on this point. *Cresson* v. *Stout,* 17 Johnson 116; *Walker* v. *Sherman,* 20 Wend. 636; *Farrar* v. *Chauffetete,* 5 Denio 527, and *Vanderpool* v. *Van Allen,* 10 Barbour 157. So in a recent case in Ohio, *Teafft* v. *Hewett et al.,* 1 Ohio N. S. 5–11, where the subject was examined at great length, and with ability, it was held that the machinery in a woolen factory, connected with the motive power of the steam engine by bands and straps, and only attached to the building by cleats or other means to confine it to its proper place for use, and could be removed without injury, was but chattel property. The case of *Gale* v. *Ward,* 14 Mass. 352, in its facts, is much like the case of *Tobias* v. *Francis,* in our own reports. In that case, PARKER, CH. J., says, *though in some sense attached to the free-hold, yet they* (the machines) *could easily be disconnected, and used in buildings erected for similar purposes.*

Upon the subject of fixtures, in the English law, the case of *Elwes* v. *Mawe,* 3 East 38, and reprinted in Smith's Leading Cases, may well be considered *the leading case.* In that case, and in the notes to it by Mr. Smith, and the American editor, most of the law on that subject is collected.

In a case decided in the Court of Exchequer, in 1851, *Hellawell* v. *Eastwood,* 6 Welsby, Hurlstone & Gordon 295, it was held that machinery, consisting of certain cotton spinning-machines,

some of which were fixed by screws to the wooden floor, and some by screws which had been sunk into holes in the stone flooring, and secured by molten lead poured into them, were still personal property. B. PARK said the only question was, whether the machines, when fixed, were a parcel of the freehold, and this was a question of fact, depending on the circumstances of each case, and principally on the two considerations; first, the mode of annexation to the soil or fabric of the house, and the *extent* to which it was united to them, whether it could be easily removed without injury to itself or the building; secondly, on the object and purpose of the annexation, whether it was for the permanent and substantial improvement of the dwelling, or merely for a temporary purpose, or the more complete enjoyment and use of it *as a chattel.*

He added, we cannot doubt that the machines never became a part of the freehold. They were attached slightly, so as to be capable of removal, without the least injury to the fabric of the building, or to themselves; and the object and purpose of the annexation was not to *improve the inheritance,* but merely to render the machines steadier and more capable of convenient use, *as chattels.* In that case, it is true, the question arose between landlord and tenant, and in such a case, it is said in the English law, the greatest indulgence is shown to the tenant, where the annexations are made for the purposes of trade or manufactures. No doubt in England, in relation to fixtures, different rules have been held to prevail; and between heir and executor, a strict rule has been adopted, and the same rule seems to have prevailed between vendor and vendee, and between mortgagor and mortgagee; and the English cases show that there is no relaxation of the rule, as applied in these latter cases, even between landlord and tenant, where the erections are made *solely for the purposes of agriculture,* although beneficial and important in improving the occupancy of the estate. We apprehend that much of the confusion in the authorities upon the subject of fixtures, may have had its origin in the fact that different rules have been attempted to be applied to different relations, and these different relations have sometimes been lost sight of.

It is said by COLLAMER, J., in *Sturgis* v. *Warren,* 11 Vt., that

"in this state, and especially under our attachment law, it is difficult to recognize any such distinctions."

In *Dubois* v. *Shelley et al.*, 10 Barb. 496, it was held the same rule should be applied, as to fixtures, whether the erections were for agricultural and other purposes, or for the purposes of trade, and between landlord and tenant.

In *Van Ness* v. *Pacard*, 2 Peter's U. S. R. 145, it is strongly intimated that, in this country, there should be no different rule applied, whether the erections were made for *the purposes of trade* and *manufactures*, or purely for *agricultural purposes*.

We think the rule in this state should be that the various articles of machinery belonging to a manufactory are, in no respect, real estate, excepting as they are a part of the freehold, or substantially attached to it, and that it is not sufficient to make them a part of the freehold if they are attached to the building for the purpose, and in the manner adapted to keep them steady, and that their use may be more beneficial as chattels, and in such a way that will admit of their removal without any material injury to the freehold, or to the chattels. Neither is it enough to make them real estate that they are essential to the occupation of the building for the business carried on in it. In the construction of a building, many things, which in themselves are chattels, as doors, window-blinds, shutters, &c., become a part of the building, and, in such cases, the manner of annexation is of no particular importance. But to make the *test*, whether fixture or no fixture, to be found in the relation which the chattel bears to the use of the freehold, is, to us, unwise, and against well considered cases. The rule requiring *actual annexation*, is not affected by those cases where a *constructive annexation* has been held sufficient. Those cases may be regarded as exceptions to the general rule, or else as cases where the *things* were *mere incidents* to the freehold, and became a part of *it*, and passed with it, upon a principle different from that of its being a fixture.

In determining the character of what the plaintiff claims to be *fixtures*, or a part of the realty, we must not only have reference to the manner and extent of the annexation, but also to the *object* and *purpose* of it. Whether the articles in question were personal

property, or *fixtures*, should be determinable, and plainly appear, from an inspection of the property itself, taking into consideration their *nature*, the *mode* and *extent* of *their annexation*, and their purpose and object, from which the *intention* would be indicated.

To change the nature and legal qualities of a chattel into a fixture, requires a positive act on the part of the person making the annexation, and, his intention so to do, should positively appear, and, if this be left in doubt, the article should be held still to be personal property.

We see no reason why the case of the potash kettles, in 5 Vt., should not govern this, as to the iron boiler. It was set in a brickwork, resting upon a stone foundation placed upon the ground, and the floor of the building was simply laid up to it, and it was in no other way attached to the building. So in *Hunt* v. *Mulanphy*, 1 Missouri 508, a kettle and boilers put up in a tannery, with brick and mortar, was held not to be a fixture. See also *Reynolds* v. *Shuler*, 5 Cowen 323, and *Raymond* v. *White* 7 Cowen 319, which was the case of a heater used for applying heat to tanners' bark, in vats and leaches.

We think the four engines, used for grinding rags into pulp, cannot be regarded as a part of the paper-mill, or as annexed to it, so as to become a part of the realty. These were fixed in large oval tubs, in the usual way, the tubs standing on timbers, and the floor of the building scribed up to them, and the engines were carried and operated by means of a band connecting them with the iron shafting, from which was communicated to the engines their *motive power*. There can be no ground to claim that the tubs, in which they stood, were a part of the realty, and the band was used to give the engines motion, and not for fastening them to the freehold. It could be slipped off, and put on, to give them motion, or arrest it, at the will of the operator, and they could be removed without injury to the building, or the engines. The case of *Winslow* v. *Merchants' Insurance Company*, 4 Met. 306, where it was held that a steam engine and boilers, and the machines for working iron, upon which they operated, were fixtures, and a part of the realty, is expressly put, so far as relates to the machines for working iron, upon *the manner* in which they were *fitted and adapted to the mill*. The words "fitted and adapted to the mill," seem to

imply something more than being set down upon the floor, and fastened for convenient use, but rather a peculiar adaptation and fitting to that particular location and mill. The building was a machine shop, and the steam engine furnished the *motive power* which moved the whole machinery in the several stories of the building, by means of connecting bands or otherwise. In regard to the case of *Gale* v. *Ward*, 14 Mass., Ch. J. Shaw, in 4 Metcalf, observed, "we do not think that an authority opposed to this opinion, because it is manifest that the court, in that case, regarded the carding machines, though ponderous and bulky, as essentially personal property, which might have been attached and removed as the personal property of the owner, even though there had been no mortgage, and they had been erected by the owner in his own mill, for his own use." Besides, so far as the steam engine is concerned, it may be said of the case in 4 Metcalf, it furnished the *motive power* for the whole building, and may be regarded as an appurtenant to the machine shop, as much so as the water power of a grist-mill, or a paper-mill. The paper presses were kept in their places by means of cleats at the top, nailed to the floor, and at the bottom by iron screws, and by taking off the iron nuts they could be removed without injuring or disturbing the building.

In regard to the iron frame, in which the calender rolls stood, it seems that was simply kept in place by means of screws at the toes of the frame, connecting it with timbers upon which it stood, and the timbers made fast to the floor by means of spikes. This could be easily removed by unscrewing the toes of the frame. The rag-cutter, stood in a wooden frame, standing on the floor, and was not otherwise confined.

The trimming press was set also in a frame, and this only screwed to the floor.

The machine for making paper was kept in place by means of cleats around it, nailed to the floor, and not otherwise fastened to the building. If we regard the iron boiler as personal property, most clearly the iron pipes connected with it only by screws and bolts, which the case says could be easily taken off, should be regarded in the same light.

The iron shafting put up in the building for the purpose of turning and putting in motion the machinery, by means of hangers of

iron bolted to the beams and sills of the building, we are disposed to regard as a constituent part of the mill. The shafting was necessary to communicate the *motive power* to the machinery, and should be regarded as a part of the mill, as much as a water-wheel, by which a water-power is called into existence.

Though the paper-mill was placed upon the premises subsequent to the execution of the mortgage, yet it would enure to the benefit of the mortgagee, and also carry with it all that can be regarded as incident to, or a component part of the mill, but the machinery and articles which the mortgagors placed in the building, to be used by them in their business as manufacturers of paper, and not permanently attached to the building or freehold in such a manner that they could not well be removed without material injury to the chattel or freehold, did not lose their personal identity as chattels, and become a part of the realty. This, we think, has long been the the views of our courts upon this subject.

The result will be that, so far as the irons in question either constituted the whole, or were a part of the machinery of *such a description and character,* they remained the personal property of the mortgagors, after the fire, the same as the machinery was before the fire, and the plaintiff's right of recovery should have been limited at least to the value of the iron which was used in the construction of the building, such as nails, spikes, &c., and the iron shafting used for the purpose of putting and keeping the machinery in motion, and such iron, if any, as was permanently fixed or fastened to the building so as to be annexed to and become a part of the realty, according to the foregoing views.

Whether it was of any importance that the plaintiff should have taken the actual possession of these irons, after the fire, so as to perfect and keep good his title, as against the creditors of the mortgagors, is a point not made in the case, and one which we have not considered, and much less decided.

Judgment reversed and cause remanded.